# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# 1:08cv460

| | |
|---|---|
| FIDELITY AND GUARANTY INSURANCE COMPANY, ) ) ) Plaintiff, ) ) Vs. ) ) CONSTRUCTION ADVANTAGE, INC.; and JAMES H. OGLE, ) ) ) Defendants. ) ) | MEMORANDUM AND RECOMMENDATION |

**THIS MATTER** is before the court upon plaintiff's Motion for Summary Judgment Against Defendants Construction Advantage, Inc., and James H. Ogle. On January 11, 2010, the court conducted a hearing at which oral arguments were presented. Having considered plaintiff's motion, defendants' response, plaintiffs' reply, and the arguments of respective counsel, the court enters the following findings, conclusions, and recommendation.

## FINDINGS AND CONCLUSIONS

**I.    Background**

    **A.    Nature of the Action and Motion**

This is an indemnity action by a performance bond surety against a corporate

-1-

indemnitor and an individual indemnitor. Plaintiff Fidelity and Guaranty Insurance Company (hereinafter "FGIC") paid a performance bond claim arising from allegedly defective construction work performed by its bonded principal, Construction Advantage, Inc. (hereinafter "CAI"), and pursuant to a written indemnity agreement between FGIC and CAI and its president, James H. Ogle (hereinafter "Ogle"). FGIC contends that CAI and Ogle are liable for all losses incurred by FGIC in investigating, defending and paying the claim.

In moving for summary judgment, FGIC contends that judgment should entered in favor of FGIC because

(1) FGIC paid a performance bond claim asserted by the obligee of a performance bond issued by FGIC on CAI's behalf;

(2) The express language of the applicable General Agreement of Indemnity (hereinafter "GAI") requires CAI and Ogle to reimburse FGIC for all losses incurred by FGIC in defending and paying the performance bond claim at issue; and

(3) the undisputed evidence demonstrates that FGIC exercised good faith in investigating, resolving and paying the performance bond claim at issue.

In response, defendants argue that plaintiff paid such bond in bad faith and point to a number of defenses that should have been asserted in the state court action by FGIC

as well as other motivations FGIC may have had for paying the bond.

**B.      Undisputed Facts**

CAI was actively engaged in the construction industry from January 20, 1998, when it was incorporated through the end of 2001 when it stopped performing work and allowed its general contractor's license to lapse. CAI was a general contractor that focused on roofing and re-roofing projects. Bouchard Aff., Plaintiff's Ex. A, pp. 14, 17-18, 28; Ex. B.

On May 13, 1998, CAI, Ogle and a number of other individual indemnitors executed a Master Surety Agreement in favor of FGIC. Bouchard Aff., Plaintiff's Ex. F, pp. FGIC00198-00202. On September 22, 1999, CAI and Ogle executed a separate General Agreement of Indemnity in favor of FGIC. Id., at pp. FGIC00203-00212. Ogle testified at his deposition that this separate General Agreement of Indemnity was executed because his partners at CAI had left the company, and he authenticated at his deposition a letter by which he requested "a new master surety agreement with James H. Ogle as the only stockholder." Bouchard Aff., Plaintiff's Ex. A, pp. 21-22, 57-59. Ogle testified at his deposition that he entered into this separate agreement so that FGIC would continue to issue performance and payment bonds on CAI's behalf. Id., at pp. 59-60.

On July 18, 2000, FGIC issued performance and payment bonds on behalf of

CAI in connection with a contract between CAI as general contractor and the Buncombe County Board of Education (the "Board") for the performance of a construction project commonly known as the "2000-2001 Re-Roofing Project" (the "Project"). Bouchard Aff., Plaintiff's Ex. E. The Performance Bond identifies FGIC as the bond "Surety," CAI as the bond "Principal," and the Board as the "Contracting Body" to whom FGIC became bound under the bond. Id., at pp. FGIC00110-00111. The Performance Bond also sets forth a penal sum of $163,080, id., which it the amount of the agreement CAI entered into with the Board for the performance of the Project work. Bouchard Aff., Plaintiff's Ex. D, pp. FGIC00011-00012.

Ogle testified at his deposition that CAI's scope of work on the Project included both furnishing the roofing materials and providing the labor necessary for the completion of the re-roofing Project. Bouchard Aff., Plaintiff's Ex. A, p. 52. The contract between CAI and the Board encompassed six school buildings and required the installation of a TPO-membrane mechanically attached to existing roof decks. Id., at p. 32. Ogle testified that the Project achieved final completion by January 31, 2001. Id., at pp. 49-50.

On April 22, 2005, the Board began requesting proposals from roofing consultants to investigate certain leaks and other moisture issues affecting the roofs upon which CAI performed Project work. Affidavit of Stuart W. Sutton, PE RRC

(hereinafter "Sutton Aff."), Ex. A, p. FGIC00253. The Board ultimately retained Richard P. Canon, PE RRC (hereinafter "Canon"), to evaluate the roofs, and on July 24, 2005, Canon issued a forensic report concluding that "the roofs on each of the four schools I observed are deficient and have allowed water to intrude into the system." The report also concluded that "[t]here are defects in the materials, and there is incorrect installation of the materials," and that "there are extensive deficiencies in the installation by Construction Advantage." Id., at pp. FGIC00255-00256.

On August 23, 2005, the Board informed FGIC that based on the Canon report, it considered CAI's work on the Project defective, made a claim against the Performance Bond, and demanded that FGIC pay for the repair or replacement of the roofs in question. Bouchard Aff., Plaintiff's Ex. D, pp. FGIC00020-00021. By such date, however, CAI had filed Articles of Dissolution with the North Carolina Secretary of State's office. Id., pp. 27-28; Plaintiff's Ex. C.

FGIC responded to the Board's Performance Bond Claim by retaining its own registered roof consultant, Stuart W. Sutton, PE RRC (hereinafter "Sutton"), to attend an onsite-meeting with representatives of the Board and of the membrane manufacturer, GenFlex Roofing Materials, on October 18, 2005. Sutton Aff., at ¶¶ 5-6.

On August 10, 2006, the Board filed a civil action against CAI and FGIC,

alleging, *inter alia*, breach of the Performance Bond by FGIC and seeking, *inter alia*, the penal sum of the bond, attorneys' fees and extra-contractual damages. Bouchard Aff., Plaintiff's Ex. A, at pp. 32-33; Plaintiff's Ex. D.

While defendants argue that FGIC should have attempted to compromise the Board's claim, the only relevant evidence as to the position of the Board is found in the affidavit of Ahmad Naseem, plaintiff's Bond Claim Representative, who averred that, from communications with the Board after it filed its civil action, it was clear that the Board would not settle with FGIC for anything less than the penal sum of the Performance Bond. See Affidavit of Ahmad Naseem (hereinafter "Naseem Aff."), at ¶¶ 7-8. In an effort to mitigate its loss and avoid the expense of formal discovery, FGIC elected to engage in "informal discovery" with counsel for the Board to receive answers to certain questions FGIC had with respect to the Board's Performance Bond Claim. Id., ¶ 9. The goal of the informal discovery was to evaluate the merits of the Board's Performance Bond Claim and potentially expedite a negotiated resolution. Id.

On January 29, 2007, FGIC served the informal discovery on counsel for the Board and received responses to the questions on February 22, 2007. Id., at ¶¶ 10-11. The responses indicated that the Board had expended substantial sums to replace one of the four affected roofs and suggested that the total loss incurred by the Board

would exceed the penal sum of the Performance Bond. Id., at ¶ 13. Indeed, it appeared to plaintiff that the cost to the Board to replace the roofs would exceed the amount of the bond by over $13,000.00. Id. The responses also provided that the Board was unwilling to compromise with FGIC for anything less than the penal sum of the Performance Bond. Id., at ¶ 12.

After receiving the Board's responses to the informal discovery requests, FGIC re-engaged the services of Sutton to investigate the moisture issues, verify the Board's contention that defects attributable to the work performed by CAI on the Project were the cause of the leak issues, and confirm that complete removal and replacement of CAI's project work was warranted under the circumstances. Id., at ¶ 14. On or about March 21, 2007, Sutton performed invasive testing in several areas of the roofs in question, and observed that the roofing insulation was wet to saturated, and extensively deteriorated, in several locations. Sutton Aff., at ¶ 11. Sutton also observed extensive cracking of roofing membrane, loose gravel not removed prior to placement of the insulation, poor quality welds and open seams at various locations. Id. Based on these observations, on or about March 23, 2007, Sutton advised FGIC that the roof leaks alleged by the Board were caused by poor installation work for which CAI as general contractor was responsible, and that replacement of the roofs in question by the Board was proper. Id., ¶¶ 12-13; Naseem Aff., at ¶ 15. These

conclusions were consistent with those made by Canon, the Board's registered roof consultant. Sutton Aff., at ¶ 12.

Upon receiving such information, FGIC believed it confronted a substantial risk that it would be found liable for at least the penal sum of the Performance Bond and potentially liable for the Board's attorneys' fees and/or extra-contractual damages were the Board's civil action to advance to trial. Naseem Aff., at ¶ 16. To mitigate these risks and to reduce FGIC's loss exposure, FGIC elected to settle the Board's Performance Bond Claim for the penal amount of the bond. Id. In exchange, the Board would waive its claim to attorneys' fees and extra-contractual damages, cancel the Performance Bond and dismiss its civil action against FGIC and CAI with prejudice. Id.

A Release and Settlement Agreement dated April 5, 2007, was entered into between FGIC and the Board setting forth the terms of the parties' settlement. Id., ¶ 17. On April 10, 2007, FGIC transmitted a settlement check in the amount of $163,080.00 to the Board. Id., at ¶ 18. In addition to paying the penal sum of the Performance Bond, FGIC incurred attorneys' fees, costs and expenses, including the costs of Sutton's services, in the amount of $25,263.91, for a total loss of $188,343.91, exclusive of any prejudgment interest to which FGIC may be entitled. Affidavit of Tim Snyder (hereinafter "Snyder Aff."), at ¶¶ 6-7. Such total loss has,

however, been reduced during the course of this litigation by the payment made by a co-defendant to plaintiff in the amount of $10,000.00 in settlement funds, reducing FGIC's total loss to $178,343.91, exclusive of any prejudgment interest to which FGIC may be entitled. See Bouchard Aff., Plaintiff's Exhibit H.

## II. Standard Applicable to Motions for Summary Judgment

On a motion for summary judgment, the moving party has the burden of production to show that there are no genuine issues for trial. Upon the moving party's meeting that burden, the non-moving party has the burden of persuasion to establish that there is a genuine issue for trial.

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving [sic] party must come forward with "specific facts showing that there is a *genuine issue for trial*." Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted; emphasis in the original) (quoting Fed. R. Civ. P. 56).

There must be more than just a factual dispute; the fact in question must be material and readily identifiable by the substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). By reviewing substantive law, the court may determine what matters constitute material facts. Anderson, supra. "Only disputes over facts

that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." Id. at 248. A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Id. The court must credit factual disputes in favor of the party resisting summary judgment and draw inferences favorable to that party if the inferences are reasonable, however improbable they may seem. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980). Affidavits filed in support of a motion for summary judgment are to be used to determine whether issues of fact exist, not to decide the issues themselves. United States ex rel. Jones v. Rundle, 453 F.2d 147 (3d Cir. 1971). When resolution of issues of fact depends upon a determination of credibility, summary judgment is improper. Davis v. Zahradnick, 600 F.2d 458 (4th Cir. 1979).

In determining whether a genuine issue of material fact exists, the admissible evidence of the non-moving party must be believed and all justifiable inferences must be drawn in his or her favor. Anderson, supra, at 255. In the end, the question posed by a summary judgment motion is whether the evidence "is so one-sided that one party must prevail as a matter of law." Id., at 252.

### III. Discussion

Reimbursement of FGIC for its payment of the penal amount of the bonds as well as attorneys' fees, costs and expenses, is governed by the language of the

September 1999, GAI, which provides as follows:

> In the event of any payment by the SURETY, the UNDERSIGNED further agree that in any accounting between the SURETY and the UNDERSIGNED, the SURETY shall be entitled to charge for any and all disbursements made by it in good faith under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed. As used herein "payments made in good faith"shall be deemed to include any and all payments made by the SURETY except those made with deliberate and willful malfeasance.

Bouchard Aff., Ex. F., at ¶ 6.

Enforcement of such provision is clearly governed by the decision of the Court of Appeals for the Fourth Circuit in Fidelity and Deposit Co. of Maryland v. Bristol Steel & Iron Works, Inc., 722 F.2d 1160 (4th Cir. 1983), which addressed a nearly identical provision. Id., at 1163.[1] Under the reasoning of Bristol Steel, the only exception to a surety's right to reimbursement is

> when the payment by the surety has been made through fraud or lack of good faith on the part of the surety, but any challenge to such payment must be rested solely on that claim of bad faith or fraud.

Id. (internal quotes omitted). Thus, to avoid summary judgment, it is defendants' burden to come forward with evidence upon which the jury could find bad faith or

---

[1] Defendants' arguments that Maryland law would be applicable to this contract is unpersuasive inasmuch as North Carolina's choice of laws provisions indicate that North Carolina law would apply.

fraud on the part of FGIC in paying the penal sum of the bond.

While it is clear that it is defendants' burden to show bad faith or fraud, FGIC has satisfied its initial burden under Rule 56 of coming forward with evidence that it reasonably investigated the claim and had no improper motive in making the payment to the Board, which is evidence upon which a jury could well find such payment was made in good faith. In response, defendants have argued that the lack of communication between FGIC and defendants during the negotiations with the Board, the payment of the full amount of the bond, the failure to vigorously assert a statute of limitations defense, discrepancy in the opinion of the Board's expert indicating that the product was defective, defects in the product or system selected by the Board, and FGIC's motivation to settle to avoid "bad faith denial of claim" damages are all evidence upon which a jury could find such payment was made in bad faith.

The central problem with all these arguments is that even if taken as true, they do not provide the finder of fact with any evidence of any *improper* motive by FGIC. Courts have long held that an assertion that the surety "did not do what it should have done in order to limit or minimize" may amount to negligence; however, negligence is not the equivalent of bad faith, because improper motive is essential element of bad faith. Engbrock v. Federal Ins. Co., 370 F.2d 784, 787 (5th Cir. 1967). Indeed, North

Carolina courts addressing indemnity agreements have held as follows:

> "Where a contract confers on one party a discretionary power affecting the rights of the other, this discretion must be exercised in a reasonable manner based upon good faith and fair play." *Mezzanotte v. Freeland*, 20 N.C.App. 11, 17, 200 S.E.2d 410, 414 (1973), *cert. denied*, 284 N.C. 616, 201 S.E.2d 689 (1974); *see also Nationwide Mutual Ins. Co. v. Public Service Co. of N.C.*, 112 N.C.App. 345, 350, 435 S.E.2d 561, 564 (1993)(applying good faith requirement to indemnity provisions of an insurance contract). Assuming this good faith requirement applies to the GAI, the record is devoid of any evidence that plaintiff acted dishonestly or in an unreasonable manner in its negotiations with Multi-County. Instead, the evidence shows that plaintiff investigated Multi-County's claim, sought defendants' input, and settled for an amount less than what Multi-County had initially demanded. Thus, we conclude that no factual issue is present with respect to defendants' claim that plaintiff did not act in good faith. *See General Accident Ins. Co. of America v. Merritt-Meridian Const. Corp.*, 975 F.Supp. 511, 518 (S.D.N.Y.1997)( "Conclusory allegations of bad faith are insufficient to defeat a motion for summary judgment in favor of a surety to enforce an indemnification agreement").

<u>Continental Cas. Co. v. Bower</u>, 2002 WL 276467, 4 (N.C.App. 2002).

The evidence is clear that FGIC investigated the claim and employed a roofing expert to evaluate the roofs in question. At the hearing, counsel for defendant conceded that he was consulted prior to consummation of the final settlement.[2] While the evidence is clear that FGIC settled for the full penal amount of the bond, it is undisputed that FGIC had reason to believe that the Board's actual cost of

---

[2] No evidence was presented as to such communications and the court refused counsel for plaintiff's proffer at the hearing as not in compliance with Rule 56(e)(1). Counsel for defendants' concession was accepted.

replacement would well exceed the penal amount, that its own expert had determined that faulty installation was *a* proximate cause of the failure of the roof systems, and that it was likely that they would also be liable for the Board's attorneys fees and extra-contractual costs in the event they did not prevail. While it is not clear whether bad faith denial of a claim damages would be available in context of the underlying law suit, a reasonable finder of fact could not ascribe improper motive to such otherwise proper motivation. Indeed, minimization of risk and reduction of overall loss exposure is the very type of expediency contemplated by the express language of the GAI and upheld by the Fourth Circuit in <u>Bristol Steel</u>.

Taking defendants argument and evidence in a light most favorable to them, defendants have at most shown that plaintiff gave greater weight to some evidence than it did to other evidence, that plaintiff was less than diligent in communicating with defendants through their counsel, that there was evidence of fault on the part of the product manufacturer, and that reasonable legal minds could have reached a different conclusion as to the likely result of the underlying law suit. Even where a surety "may have been less than diligent" in conducting its investigation and communicating with the indemnitors, "the [surety] could in good faith have determined that contesting [the] claims … was not justified." <u>Safeco Ins. Co. v. Criterion Inv. Corp.</u>, 732 F. Supp. 834, 841 (E.D. Tenn. 1989).

The undersigned has found most instructive the decision in <u>U.S. Fidelity & Guar. Co. v. Feibus</u>, 15 F. Supp. 2d 579 (M.D.Pa. 1998), wherein the district court held as follows:

> The court understands the danger in holding a principal liable for payments made by a surety on a good faith basis, when there may be no actual liability. However, the court notes that such good faith clauses, while harsh, are typical in surety agreements and have routinely been upheld. *Bristol Steel*, 722 F.2d at 1163; *Continental Cas. Co. v. American Sec. Corp.*, 443 F.2d 649 (D.C.Cir.1970); *Gundle Lining*, 85 F.3d at 201; *International Fidelity Ins. Co. v. United Constr., Inc.*, No. 91-2361, 1992 WL 46878 (E.D.Pa. March 4, 1992).
>
> Sureties enjoy such discretion to settle claims because of the important function they serve in the construction industry. The purpose of good faith clauses is to facilitate the handling of settlements by sureties and protect them from unnecessary and costly litigation. *See Transamerica*, 401 F.2d at 363. It is believed that "the expense, delay, trouble, and risk of loss to the [surety] is a sufficient safeguard against an unwarranted payment." *Engbrock v. Federal Ins. Co.*, 370 F.2d 784, 786 (5th Cir.1967).
>
> Of course, under such a provision the surety is not entitled to reimbursement for any payments made "through fraud or lack of good faith." *Bristol Steel*, 722 F.2d at 1163. Courts have recognized that the one exception to enforcement of a principal's liability for a surety's disbursement is bad faith or fraudulent payment. *See id.; Engbrock*, 370 F.2d at 786; *International Fidelity Co. v. United Constr., Inc.*, No. 91-2361, 1992 WL 46878 *2 (E.D.Pa. March 4, 1992). Thus, a claim of fraud or bad faith acts as a defense and, if properly supported, creates a genuine issue of material fact. . . .
>
> * * *
>
> Bad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 751

(3d Cir.1994) (*citing Black's Law Dictionary* 139 (6th ed.1990)). Thus, a lack of diligence or negligence is not the equivalent of bad faith, indeed even gross negligence cannot support a finding of bad faith. See *Klinger v. State Farm Mut. Auto. Ins. Co.*, 895 F.Supp. 709, 713 (M.D.Pa.1995); *Terletsky v. Prudential Prop. and Cas. Ins. Co.*, 437 Pa.Super. 108, 125, 649 A.2d 680, 688 (1994). Bad faith requires a showing of recklessness or improper motive such as self-interest or ill will. *Polselli*, 23 F.3d at 751; *Klinger*, 895 F.Supp. at 713.

Id., at 584-85.

While defendants have argued that plaintiff was improperly motivated by the Board's cause of action for bad faith denial of their claim on the bond, or for "extra-contractual damages, see Response, at 11, the only evidence the court has of plaintiff's motivation is the affidavit of Mr. Naseem, in which he avers in relevant part as follows:

> At all relevant times during my involvement on the evaluation and resolution of the Board's performance Bond Claim, legal counsel for the Board made it abundantly clear that the Board would accept nothing less than the penal sum . . . . Throughout my involvement, the Board consistently threatened that in addition to the penal sum of the performance bond, it would pursue extra-contractual damages against FGIC for its alleged bad faith in initially denying the Board's Performance Bond Claim, an allegation that FGIC denies. The Board also consistently threatened that in the absence of a settlement for the penal sum of the performance bond, it would pursue statutory attorneys' fees under the authority of N.C.Gen. Stat. § 44A-35.

Naseem Aff., at ¶ 7. While there is evidence that the possibility of liability for extra-contractual damages was considered by plaintiff, it is clear that such was only one of

a number of factors considered by plaintiff in making it determination to settle with the Board. See id., at ¶ 16. While such factor may be some evidence of "self interest," it is not evidence of an improper self-interest inasmuch as it not improper for a surety to make decisions that would mitigate loss. Indeed, the GAI specifically foresees such eventuality and provide that the surety

> shall be entitled to charge for any and all disbursements made by it in good faith under the belief that it is or was liable for the sums and amounts so disbursed, or that it was necessary or expedient to make such disbursements, whether or not such liability, necessity or expediency existed.

Bouchard Aff., Ex. F., at ¶ 6.

By the time the decision was made to settle the claim, plaintiff had before it compelling evidence that the Board had taken appropriate action in replacing the roof systems and that "defective work performed by CAI was the primary cause." Naseem Aff., at ¶ 15. There simply is no evidence upon which a finder of fact could find that plaintiff acted in bad faith or "with willful and deliberate malfeasance." See Docket Entry #32-6, at p. 10, ¶ 6. For such reason, the undersigned is compelled to recommend that plaintiff, having made the requisite showing under Rule 56, be awarded the judgment it seeks.

## RECOMMENDATION

**IT IS, THEREFORE, RESPECTFULLY RECOMMENDED** that plaintiff's Motion for Summary Judgment (#30) be **ALLOWED/DENIED,** and that **JUDGMENT** be entered in favor of plaintiff and against defendant in the amount of $178,343.91, exclusive of any prejudgment interest to which FGIC may be entitled.

## Time for Objections

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir.), cert. denied, 467 U.S. 1208 (1984).

Signed: January 19, 2010

*Dennis L. Howell*

Dennis L. Howell
United States Magistrate Judge